Good morning, your honors. My name is Jim Lopes, and I represent Mr. Bonivert. I'd like to reserve five minutes for rebuttal. The central issue in this appeal is whether or not the officers are entitled to qualified immunity for their illegal entry into Mr. Bonivert's home. And I would submit to you that the Sixth Circuit case Cummings is remarkably similar to this case. And the Sixth Circuit held that the officers there were clearly not entitled to qualified immunity. And I said, but you should do the same. Cummings, like this case, was a domestic violence case. Cummings, the officer in that case with the spouse outside the house. Actually, the spouse was in a different house at the time that the officers arrived, your honor. Our case. No, in the Cummings, in our case, the spouse was outside the house. With the child. With the child and with no intention of going back inside, which the officers knew. In the Cummings case, I don't know that they give the name of the woman who made the report, but she reported from the house that she shared with Mr. Cummings and by the time they got there, Mr. Cummings was in the house next door. So the woman who reported is in one house and the police went to a different house where the reporting victim isn't. And then Officer Sherman put his foot, when the door was partially opened, inside the door so that he could block closing it. And he did block closing it. And the holding of Cummings was that when Cummings attempted to, Cummings' attempt to close the door constituted a termination of consensual encounter and communicated his lack of consent to any further intrusion by the officers. And the police officers in that case argued that, well, we didn't know it wasn't clearly established. How were we to know that that was a communication of an express refusal to enter? And the court said, and this is on page 687 of the Cummings opinion, one need not go any further than the Supreme Court precedent to see that Cummings' constitutional rights were clearly established. And they did that in Dayton and Welsh. The Cummings case was decided in 2005. So let me just go back to the two incidents or events that I see as relevant to vitiating the consent were the locking of the door and then also his effort to close the door once they got in. Is there anything else that we should be looking at? I think you can also look at the statements that he made when he did come to the door. He did come to the door and it's undisputed that he said, you're going to pay for that. He testified and it's in the record that he said, what do you want? It's also undisputed that the officer, Sergeant Cummings, ordered him to come out or we're coming in, which is a blatant violation of the Fourth Amendment and contrary to U.S. Supreme Court precedent. You don't have to come out. And there's this sort of strange heads I win, tails you lose kind of aspect to the officer's position here. Initially, Sergeant Cummings says he was disturbed that things were so quiet. Things were so quiet that he had a concern that he had to talk to Mr. Bonnevere. And they ordered him to come out, which he has no right to do. It's not really disputed. Cummings and Bonnevere both testified. He didn't come out. He did not step outside ever. So I understand that they break the little window and open the door and come in. Sergeant Cummings breaks the window, which is something he has discussed with all the officers that he's going to do. He's got two officers behind him. He says he puts his hand through the hole in the window. And he says at that moment, Bonnevere opened the door. Then Bonnevere opened the door. So by then, Bonnevere makes the statements and then Bonnevere tries to shut the door, correct? Correct. But they then, is that when they taser him? They taser him as he's standing inside the doorway. The city of Clarkston argues that the video shows you that both Cummings and Bonnevere are wrong. But I think even Judge Rice says the video doesn't really clearly show much. And it doesn't show where his feet are. So the video doesn't help you. You have the undisputed testimony of Cummings and Bonnevere that he's inside his house when he's tased. When he's tased, he's hit with one dart, but he's not hit with the other dart. And you need to hit a person with both darts for a taser to work in that fashion. Let's assume that there was a constitutional violation. The leading Supreme Court case on refusal is Georgia v. Randolph. Yes. And that's a pure search case, isn't it? Yes. It doesn't involve a domestic disturbance. Yes, but Cummings does. And Cummings is from where? Sixth Circuit, Your Honor. Cummings does. Let me check before I say. Williams involves drugs. Moore involves domestic violence. Moore involves domestic violence and Corcoran involves, I believe, drugs. But even if the Cummings court was wrong in 2005, that it wasn't clearly established then, by the time 2012, I believe, comes along, we have all these other cases from the circuits. We have Williams and Cummings. You have a couple of district court cases. And what the district court relied on in this case is Moore. And you will decide, but I think Moore is nothing like this case. Moore never came to the door, ever, even though he was asked to come to the door, both by police who knocked and rang the bell and said, come to the door. It's a long chain of events in Moore. The police had Mr. Moore's house under surveillance beginning, I think, at about 8 o'clock in the morning, and they don't actually enter his house until after 8 o'clock at night. They're surveying it. They're surveying it. They see the fiancé leave and go to work early in the morning. They see he come out and go to the garage once in the afternoon. They go to the door. They knock. They announce themselves. He doesn't come to the door. Nothing. He doesn't speak to them. Nothing. They then try eventually later in the afternoon calling his fiancé. They call his fiancé and they reach her. She's at work. They get information from her about who's inside the house. She says, my sister, my three children, and Mr. Moore are inside the house. They say, we want to get in. She comes home. She gets home in the early evening hours. I don't remember exactly when. She says, I've got my keys. She tries to open the door, but the deadbolt is on from the inside and she can't open it. She knocks. She yells. She says to Moore inside, open up, open up. The police are here. Open up. He doesn't come to the door. They then turn to the fiancé and say, can we kick the door in? And she says yes, and they do. Moore never came to the door. Moore never spoke to them. Moore never engaged them in any way. He never said anything to them. In this case, after he was shot with the taser, after already saying you're going to have to pay for that and what do you want, he used the F word and turned around. Why does it make such a difference that Moore never spoke to them? As far as from the police's point of view, whether this is an established right or not, they had gotten consent from the person who lived there, right? She said it was okay. Not to use force, Your Honor, no. Well, we're not talking about using force now. We're talking about getting into the house. We'll get to the force part. They had that okay. The question is, is it that clear that that okay didn't give them the okay to go in? Well, when you have a man standing there in the door who's closing the door on you, my position is you don't need any case. Well, they had a case. You don't need any case. But, Mr. Loebson, didn't the Ninth Circuit say there was such a case in Williams, and that's why Moore was different because Williams, at least as I read it, was more like this case where the guy is shutting the door on them. They said that was affirmative, whereas Moore was, I suppose they called him acquiescence. Yes. So at that point, it seemed that by the time we had Moore and the Eighth Circuit had Williams, we had drawn a line between, I guess, the quiet acquiescence and then the person who tries to shut the door on you. Yes. So my position is sort of twofold, Your Honor. You don't need a case, but if you do need a case, you have several. You have Williams. You have Cummings. You have Sims, which is a district court case. And I realize that Corcoran is not a Fourth Amendment case, but it's a Ninth Circuit case from 1970, which, again, recognized the obvious. The holding of that case is the closing of the door constituted the requisite refusal of admittance. If their position is right, then a person who can't speak, who's mute, could never effectively refuse police entry because they can't speak vocally. That's not required. Did you want to save the remaining time?  Thank you. Good morning, Your Honors. I'm Chris Curley, representing the City of Clarkston and the two officers from the City of Clarkston Police Department, Officers Combs and Purcell. My colleague, Ms. Trivett, represents Soton County. She's going to take five minutes to address the integral participant issue, and I'm going to do my best here to address everything else. All right. Of course, the key issue here is Georgia v. Randolph. What did it mean? What did it mean as of January of 2012 when this conduct took place? What is express refusal of consent? Well, how can you get more express than turning the lock on a door? Well, you know, Your Honor, there's language in the cases that suggests that express refusal means a stated refusal. Where does that say that? In other words, you would have to say, I'm locking the door to keep you out. Or you can't come in, or words to that effect. And I know that seems a little bit stretched. It does. I admit that. So I'm looking for what case says that. Well, Fernandez v. California, all right? That was a Supreme Court case from 2014. And in Fernandez, the Court revisited its holding in Randolph, discussed the Randolph holding at length. Now, the issue there was presence. It wasn't express refusal. However, the Fernandez Court did state, quote, if Randolph is taken at its word, that it applies only when the objector is standing in the door saying, stay out, when officers propose to make a consent search, all of these problems disappear. And the Court had been discussing all of the problems that could attend if the rule was as suggested by the plaintiff. Well, how about if we leave the door aside, leave the locking of the door aside, and then we now go to when the officers break into the guy's house, and he's there, and he tries to close the door on him as they come in? Yeah. Doesn't the ---- I mean, if you try to come into my house and I try to shut the door on you, do I have to say, stay out, I'm trying to shut the door on you? Well, here's what the Court ---- So what's the problem? Here's what the Court said. I'm going to go one step further so that you answer both our questions, hopefully, at the same time. The fact that you have to break a window to get into somebody's house, isn't that a clue that you knew at the time that somebody didn't want you to come in? Well, at that point, we're still within the scope of Ms. Osmond's original consent. She told the officers that they could go in. The doors were locked. There's no question about that. But, you know, I think we know from U.S. v. McCarroll that the mere fact that doors are locked, and the doors were locked in Moore too, just because doors are locked, that doesn't mean that that's express refusal within the meaning of Georgia v. Randolph. How about when you then ---- Okay, so now you're a little unsure. Is it express? Is it implied? And then he tries to shut the door on you. Isn't that sort of a horse of a different color kind of thing? Your Honor, I will answer that question very directly in one minute after I recite some language from U.S. v. McCarroll. Okay, thank you. U.S. v. McCarroll. That's a case that was on the books in 2007. Just in your brief? Yes. And the court there discussed express v. implied at length. And here's some of the language the court used in McCarroll about what express refusal means in the context of door closing. Quote, To be sure, the district court could have inferred that shutting the door in the face of an imminent arrest amounts to an implied directive for the officers to stay out. Regardless, we conclude that Randolph's narrow holding does not apply here. They went on to say, and at this point they were addressing the ambiguity of the gesture because the argument that was being made was, well, he's not shutting the door because he's telling the officers to stay out. He's shutting the door because he wants to avoid being arrested. Is it a fine point? Absolutely it is. But here's what the McCarroll court said about that. Quote, While McCarroll asked us to infer that he impliedly refused to consent when he closed his doors to the police, the parties legitimately dispute whether this conduct related to McCarroll's desire to avoid arrest or to his desire to direct the officers to leave his Whatever meaning we could decipher from McCarroll's action, Randolph explicitly declined to conduct this inquiry when it required the defendant to have expressly objected to the search. So, yes, it's a fine point. But if you look at the language used by the court in Randolph, express refusal, stated refusal, the language used by the court in Ramirez when it was discussing Randolph, you've got to say stay out. Courts recognizing that the Randolph court itself indicated that it was drawing a fine line and that it was formulistic. You know, a reasonable officer in the shoes of Combs and Purcell could easily have interpreted Mr. Bonner's actions as not express refusal within the meaning of Randolph. So you would be asking this court to say that it had to be stated verbally, orally has to be stated in so many words. Keep out. I don't think the court needs to reach that issue, frankly, and I, it's fairly debatable, but the point is, you know, was it clearly established in January of 2012 that your If it were, if it were established, is there a factual dispute here about what happens after they put their hand through the officers, put their hand through the door and he's there and they're having these verbal back and forth. Is there any ambiguity in those statements about what, well, I don't know about ambiguity in the statements, or I should say is there a potential factual conflict because they didn't hear, they don't think they heard what he said. I certainly think there's ambiguity in the conduct after this individual, Mr. Bonner has been shot twice with a taser at point blank range. And you can see this in the video. He's reacting instinctively to being shot by a taser and he's waving his hands around, swiping at the wires, backing up, doing what anybody would do in that situation. I suppose, try to put whatever physical barrier you have at your disposal between you and these people who are shooting tasers at you. I think his conduct is just as consistent with trying to get away from the tasers as it is with him saying, stay out of my house. But isn't that too late? I mean, and I mean, that's sort of like after he's said this stuff to the officers and he's tried to shut the door. They're now like they're in there, right? When they shoot the taser, aren't they in the house over the threshold? No, they're not. They're only through the little window? No, Your Honor. Because of the crack in the door? We might as well talk about the video now. Sure. We watched the video. Yeah, Mr. Bonnevert, and I have too, hundreds of times. And Mr. Bonnevert claims that that video shows that he doesn't exit his house. And I don't know how you can compare. And Mr. Bonnevert was kind enough to supply us with some freeze frames from the video and the brief. And I don't know how you can compare the second frame with the sixth frame and conclude that Mr. Bonnevert did not advance through his doorway. Suppose Mr. Bonnevert, when the officer, this is hypothetical, when the officers first wanted to gain entry, had simply looked out at them and went thumbs down. Would that be enough? It's certainly a closer call. What if he put thumbs down and shook his head from side to side? Well, if I were not arguing qualified immunity and I was just arguing whether or not that should be considered express refusal, I would agree because it makes sense. But given the language that was contained in these cases, particularly in the McCarroll, the legal landscape that existed as of January 2012. McCarroll's from where? Tenth Circuit. It wasn't clearly established. So the difference is, you know, I understand the Carroll court said what it said, but what difference for the purposes of the inquiry we're about here today does it make whether the guy thinks there's drugs inside the house and doesn't want them to come in or just doesn't want them to come in? Well, I'm not sure what Your Honor means by what difference does it make, but I was listening when you. The case you're relying upon says that makes a difference. And I'm not sure which case it is, but. Carroll. McCarroll? Yeah. Okay. Well, the McCarroll court said if it's ambiguous, okay, as to why he's telling the officers, you know, or what is being communicated to the officers by the actions. I guess my follow-on is what difference does it make practically if it is ambiguous? Let's say the reason he said don't come in was because he didn't want to be arrested. That's the dichotomy I think that McCarroll said. And I think what is the difference between those two things? Well, then it's not express refusal under Randolph, or at least that's fairly debatable. The qualified immunity requires that the issue be beyond debate, and given the language that's contained in these cases, I just don't think it was as of January 2012. Could the district court, if we remand, could the district court at the conclusion of evidence agree with your position? Could the district court agree with my position? Certainly. And end the case at that point? Yes. Okay. Let me touch on a couple of the other exceptions. Okay, just so you know, you're kind of cutting into your colleague's time, but what else did you want to touch on? I'm not going to cut into my colleague's time. No, I'm going to give her her time. All right, thank you. But this always happens. All right, well, yeah, a couple of things that weren't really touched upon in the brief that I think are worthy of bringing up. Exigent circumstances. I would agree with Mr. Bonneberg that the cases indicate that if the possible victim or alleged victim of the domestic violence is not in the house and instead is standing outside in no apparent jeopardy, as long as there's nothing going on, nothing else going on inside, exigent circumstances doesn't really fit. But what's not discussed in the briefing is, frankly, something that I just thought of as I was preparing. If these officers had a constitutional right to deploy their tasers at Mr. Bonneberg when they did, where they did, and I understand there's a dispute over that, but let's just say they did. If they had a constitutional right to deploy their tasers when they did, where they did, I think exigent circumstances now allow the officers to follow Mr. Bonneberg into the house and onto that back porch just to see if he's okay. And, again, there's no way. That's kind of some twisted logic. So after I shoot you, now I've created, I know there's not danger creation, but, you know, you've kind of created the circumstance. I know. Yeah, that one kind of twists maybe just one too far. Well, I hope not. I mean, you know, here you have officers. It's what, Code 4, no problem inside. She says there's no guns. There is no problem. Why do they want to go in there? They want to arrest him, right? Well, certainly at the time he advanced. How about a search warrant or an arrest warrant? And they've got the house surrounded. Your Honor, by the time Mr. Bonneberg advanced on these officers angrily and they deployed their tasers, the circumstances changed. He wouldn't have advanced if they hadn't broken the door and tased him, right? Well, no. Well, I mean, is there any evidence that he had made any threats or anything outside once she was removed? No. Okay. Thank you. Thank you. No, I think we have your argument in mind. Thank you very much. Would you put five minutes back on the clock for Ms. Trivett, please? Good morning, Your Honors. May it please the Court and Trivett, on behalf of the Asotan County defendants, there are three issues on appeal today that relate only to the Asotan County defendants. The first involves integral participation. Can the deputies be held liable for Sergeant Combs' warrantless entries into the home when it was the Clarkston officers who investigated the crime and made the decision to make the warrantless entry before the deputies ever arrived on scene and when the deputies had no reason to believe that the warrantless entry would be unlawful? The second issue is whether the deputies had an independent and lawful basis for the entries they actually did make into the home, given that at the time they made that decision, Sergeant Combs was already locked inside the house alone with Mr. Bonnevert, engaged in an apparent struggle. The third issue is whether they're entitled to qualified immunity. I have limited time today. I'm prepared to address the integral participation argument, but if the Court would prefer to hear argument on consent or exigency or the emergency doctrine, I'm prepared to answer those questions also. In this case, Plaintiff's Counsel misconstrues the integral participation law. He argues that any time an officer provides armed backup to an entry or a search, that officer is automatically an integral participant. The issue here is not that simple. It is not whether the deputies provided backup or participated in the warrantless entry. The issue is whether they participated in the decision to make a warrantless entry or otherwise knew that that entry would be unlawful. And we know that this is the correct analysis. If we look at integral participation case law, we look at the White v. Polly case, and we look at public policy. All of the cases cited to you involving integral participants, courts have found that officers who are providing backup to others were integral participants when those officers either engaged in the decision to conduct the unconstitutional act or they knew the act itself would be unlawful. And you can look at Boyd v. Benton County as one of the best examples of that. That was a case where officers entered a home with a warrant, and the issue was whether the use of a flashbang was constitutional or not. And when the court ruled that every backup officer was an integral participant, it specifically held that those officers all participated in the decision to use the flashbang, they didn't object to it, and they participated in its use. I would submit that if another officer arrived on scene and either didn't participate in that decision to use the flashbang or didn't know the flashbang was going to be used, then that officer would not have been an integral participant. Is there any evidence that any of the officers you're talking about asked or objected or said, why don't we just get a warrant before they went in? In the Asotan County defendants? Yeah. The evidence is that they did not respond on the scene until after the investigation was complete. There is no evidence that they participated in the discussion about whether there should be a warrant or whether to use a warrant. The only discussion they participated in with Sergeant Combs was how to enter the home, what plan should they use for officer safety purposes. And at that time, did any of them say, gee, maybe we ought to get a warrant? The doors are all locked. The officers assumed there wasn't a warrant, given the time. They knew there wouldn't have been time to get one. And they also assumed reasonably that Sergeant Combs and Officer Purcell would have conducted whatever investigation. Let me take you back a minute. There wasn't time to get one. Why? She's outside. There's no one in the house that's in any danger of getting hurt. Telephonic warrants don't take that long to get. My intention was that these officers knew that Sergeant Combs hadn't gotten a warrant because it would have taken him about an hour to do so. So they knew he didn't have one at that time. The reason there wasn't time to get a warrant goes to the exigent and emergency situations, which I could address as well. But in this case, these officers had no reason to believe that consent wouldn't have applied, that exigency wouldn't have applied, or that the emergency doctrine wouldn't have applied because there could have been facts that had unfolded before those officers ever got to the scene that would absolutely have justified a warrantless entry. I'd submit that there were. And we know that this is the right test if we look at White v. Pauley. We can't say, on the one hand, that an officer who responds late to a scene has a right to assume that those before him follow proper police procedure. But then, on the other hand, say that that late-responding officer is going to be responsible if one of the first ones made a constitutional error. But if they're there as armed backup, correct? And at that point, let's assume that they assume consent is on the table. But at that point, isn't it also imputed to them the information about the locking of the door? And once they begin to enter the house, or Officer Combs does, I should say, aren't they there and an integral part of what happens at the doorway? If we say that's true, if we say that all the information that the officers, the clerks and officers had, were automatically imputed onto the Asotin County deputies as soon as they arrived, then the policy implication from that is that they are going to be integral participants and that every single time a police officer responds to a scene to serve as backup for safety reasons, those officers would have to conduct an independent investigation to determine whether the backup that they're providing is an assistance to a constitutional or unconstitutional search or entry. How about if you're just looking at the situation from the time that everyone's at the door, then they don't need any old information to figure out what the immediate information is, do they? I mean, wouldn't they then be tagged with what's happening and his closing of the door and all of that? At the very best, what's happening at the door could impact whether or not Mr. Bonnevart had expressly refused consent to entry. That's only one of the bases for these officers to know that there would be a basis for a warrantless entry. The officers could also believe that the reason for the warrantless entry was under exigent circumstances or the emergency doctrine, and certainly they had enough information to know that that was a possibility. Did they know that she was outside? Well, if you're going to assume that they're in- No, I'm asking you, did they know, yes or no, that she was outside? When they arrived on scene, they knew people were outside, but they didn't interview any of those people or know who they are. The only evidence in this record is that they discussed the plan to effect an entry into the home. Okay, thank you. Thank you very much. I just want to say a few things about the integral participation issue. Council has referred to the Whitefeet-Pawley case that the U.S. Supreme Court handed down very early this year. In that case, the Supreme Court talked about, quote, a reasonable officer who arrives too late to an ongoing police action in circumstances like this. And I'll say in a moment what the circumstances were. I can assume that proper procedures were followed. When White arrived where he arrived, within a second or two, a man named Daniel burst out of his house with a shotgun and started firing at police. White arrived too late to know virtually anything except his fellow officers were being fired on. In this case, the record shows that the Asotin officers arrived 12 minutes after the Clarkson officers. They heard the police radio. They heard the Code 4. They saw everybody outside. And there was nothing ongoing. And they had time, and there is testimony in the record, that they formulated a plan. And council said to you, they talked about how to enter the home. And they talked about it, and Coombs told them, well, we're not going to kick the door in. We're going to break the window. That will cause less damage. And council said in the, I forget what the name of the case is she mentioned, she said there was no, Boyd, there was no objection by the other officers to the use of the flash bomb. And there was no objection here to the use of breaking, to breaking the window. Boyd holds, Boyd holds that officers present to provide armed backup are integral participants to a search. And in Hopkins, this court said that Boyd settled things such that there would not be qualified immunity for a case decided in 2009 Hopkins because Boyd settled it in 2004. Thank you, Your Honors. May I ask you a couple of questions that arose from Mr. Curley's comments? One about whether Mr. Bonnervert exited the house or not. And he's referring to the video. What is your position on that? I think the video does not make it possible for you to know.  My recollection is it shows one of the side door jams but not the other. But I might be wrong about that. But in any event, you cannot tell from the video whether any part of Mr. Bonnervert's body breaks the plane of which the door would create. I think it is possible to construe the video as saying that his upper body, that he leaned, that part of his upper body or an arm. Does it make a difference? No, it doesn't. Why are we discussing whether he's outside or inside? I don't think it makes a difference, but I was asked what the video shows. I have one other question, and that is you didn't really discuss or I don't know even reference the Fernandez v. California case, which was sort of a reprise on Randolph. I would just appreciate your thoughts as to whether that changes the consent analysis that we're looking at here. I don't think so. I think as Mr. Curley accurately said, Fernandez was a case about presence. I was trying to remember if Fernandez came to the Supreme Court from the Ninth Circuit. I kind of think it did. But at any event, Mr. Fernandez was arrested and taken away. He had previously said you can't come in. He was arrested and taken away. When he was now gone, they said, well, what are we going to do? And the question in Fernandez was does his previous express refusal to come in continue to operate when he's no longer there? The court said no. That's not the issue in this case. Mr. Bonnevert was always there. And there is a sentence in Fernandez that says something about paraphrasing the holding in Randolph and does use the word. It only applies when a person is present and is saying stay out. I do not think that you could read that as some sort of dictum which settles and says that what express means in Randolph is that you have to speak the words. And I've given some thought to that word express. The respondents always seem to treat the word express as if you have to use your lips to express it. I think the word express was actually used in Randolph to mean clear. And as Judge Hawkins said, however you express it with the thumbs down, you have to excuse me for referring again to the profanity here, but when he said you're going to have to pay for that and when he got shot with the taser, just as he closed the door, he also says F-U. That's pretty express. Thank you. Thank all counsel for your argument this morning. The case of Bonnevert v. Clarkson is submitted.
judges: Hawkins, McKeown, Rothstein